**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

DANIEL Z. CROWE; and OREGON CIVIL LIBERTIES ATTORNEYS;
LAWRENCE K. PETERSON,

Plaintiffs-Appellants,

and

LAWRENCE K, PETERSON,

Plaintiff,

vs.

OREGON STATE BAR,

Defendant-Appellee.

**PLAINTIFFS-APPELLANTS' REPLY BRIEF**

Appeal from the United States District Court for the District of Oregon
Case No. 3:18-cv-02139-JR, Hon. Michael H. Simon, presiding

<table>
<tr><td>

**MILITARY DISABILITY
LAWYER, LLC**
Luke D. Miller
1567 Edgewater St. NW
PMB 43
Salem, OR 97304
(800) 392-5682
luke@militarydisabilitylawyer.com

</td><td>

**Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE**
Scott Day Freeman
Adam Shelton
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Attorneys for Plaintiffs-Appellants*

</td></tr>
</table>

# TABLE OF CONTENTS

Table of Contents ........................................................................................... i

Table of Authorities ...................................................................................... ii

Summary of Argument ................................................................................ 1

I. *Janus* clarifies how to apply *Keller in a freedom of association claim.* ........... 1

II. There is not a *de minimis* exception to the constitutional rule that bar associations can *only* force membership if the bar association engages *only* in germane activities. ............................................................................................. 6

III. Germaneness must have limits and OSB has surpassed those limits in both its legislative program and its decision to print two politically charged statements. .................................................................................................... 9

    A. The legislation challenged by Plaintiff was not directly related to the improvement of legal services or the regulation of lawyers qua lawyers. ........................................................................................................ 10

       1. The Court should reject Appellees' preliminary arguments. ......... 10

       2. Appellees engaged in at least sixteen instances of nongermane legislative activity. ...................................................................... 12

    B. Both the OSB Statement and the Affinity Bar Statement were nongermane. ...................................................................................... 17

IV. Appellants free association claim does not depend on whether other individuals associated Appellants with OSB's conduct or whether OSB membership curtailed Appellants ability to express their own views. .......... 20

Conclusion ................................................................................................ 23

Certificate of Compliance .......................................................................... 24

Certificate of Service ................................................................................. 25

**TABLE OF AUTHORITIES**

**Cases**

*Abood v. Detroit Board of Education*, 431 U.S. 209 (1977) ...................... 2, 5, 6, 21

*Air Line Pilots Ass'n v. Miller*, 523 U.S. 866 (1998) ................................7

*Bonham v. D.C. Libr. Admin.*, 989 F.2d 1242 (D.C. Cir. 1993)..............................7

*Boudreaux v. Louisiana State Bar Ass'n*, 86 F.4th 620 (5th Cir. 2023) .......... passim

*Carroll v. Blinken*, 957 F.2d 991 (2d Cir. 1992) ....................................22

*Crowe v. Oregon State Bar*, 989 F.3d 714 (9th Cir. 2021)...................................3, 8

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) ...................................9

*Elrod v. Burns,* 427 U.S. 347 (1976) .......................................................7

*FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987) .......................................19

*File v. Martin*, 33 F.4th 385 (7th Cir. 2022), *cert. denied sub nom, File v. Hickey*, 143 S. Ct. 745 (2023)...............................................................5

*Harris v. Quinn*, 573 U.S. 616 (2014) ......................................................3

*Janus v. AFSCME*, 138 S. Ct. 2448 (2018) ..................................... passim

*Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720 (2020) .................................5

*Keller v. State Bar of California*, 496 U.S. 1 (1990) ...................... passim

*Knox v. SEIU*, 567 U.S. 298 (2012)..................................................4, 13

*Lathrop v. Donohue*, 367 U.S. 820 (1961) .................................... 3, 5, 6, 8

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ...........................7

*McDonald v. Longley,* 4 F.4th 229 (5th Cir. 2021), *cert. denied sub nom. McDonald v. Firth,* 142 S. Ct. 1442 (2022) ................................. passim

*Mentele v. Inslee*, 916 F.3d 783 (9th Cir. 2019) ....................................21

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ....................................................4, 20

*Taylor v. Buchanan*, 4 F.4th 406 (6th Cir. 2021) .......................................................4

*Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935 (9th Cir. 2007)............................21

*United States v. Rodriguez-Gamboa*, 946 F.3d 548 (9th Cir. 2019) .......................11

**Other Authorities**

Appellees Br., *McDonald v. Longley*, No. 20-50448, 2020 WL 4436953 (5th Cir., July 30, 2020)...........................................................................................................8

Seana Valentine Shiffrin, *What Is Really Wrong with Compelled Association?*, 99 Nw. U. L. Rev. 839 (2005) ...................................................................................22

**SUMMARY OF ARGUMENT**

As Appellants proved below, the Oregon State Bar Association (OSB) engages in nongermane activity as defined by *Keller v. State Bar of California*, 496 U.S. 1 (1990), and clarified by the Supreme Court in *Janus v. AFSCME*, 138 S. Ct. 2448 (2018). OSB does this through its legislative advocacy and articles it publishes in its *Bar Bulletin*. By engaging in this nongermane activity, OSB violates the constitutional rights of its members.

Appellants' rights are violated because they are forced to associate with OSB's nongermane activity. Contrary to OSB's arguments, there is no *de minimis* or major activity threshold this nongermane activity must cross before it violates constitutional rights. *Boudreaux v. Louisiana State Bar Ass'n*, 86 F.4th 620, 636–38 (5th Cir. 2023); *McDonald v. Longley*, 4 F.4th 229, 248–49 (5th Cir. 2021). Furthermore, the constitutional violation is not contingent upon, as Appellees seem to believe, third parties associating Appellants with OSB's activities. Nor are Appellants required to show that their forced association prevents them from expressing their own opinions. See, *infra* Section IV. The associational injury arises from OSB's conduct and Appellants' compelled membership.

**I.** *Janus* **clarifies how to apply** *Keller in a freedom of association claim.*

Appellees misunderstand the relationship between *Janus* and *Keller*. They argue that *Janus* is irrelevant because it did not expressly overrule *Keller* and that

*Keller* alone is sufficient to address Appellants' freedom of association claim. *See* Answering Br. (Ans. Br.) at 22–26. But although *Janus* did not expressly overrule *Keller*, it undermined its foundations by overruling *Abood*, leaving *Keller* of limited application. Furthermore, as this Court noted in *Crowe I*, *Keller*'s holding did not address the freedom of association claim Appellants bring here. *Janus* does and is, therefore, authoritative here.

The Supreme Court clarified in *Janus* that exacting scrutiny applies to forced association claims in the union context. 138 S. Ct. at 2477. This standard must also apply to forced association in this context for two reasons: **first**, *Keller* itself said compulsory bar associations are subject to "the same constitutional rule … as are labor unions," 496 U.S. at 13, and **second**, *Keller* was largely based on the Court's decision in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977)—a case about compelled association with unions, which means that *Janus*'s rule (which partly overrode *Abood* and declared that exacting scrutiny must apply with respect to unions) must now govern. In short, the question left open by *Keller* has now been answered by *Janus*.

*Keller* held that a mandatory bar association could use member dues to fund activities that were "germane to those goals" of "regulating the legal profession and improving the quality of legal services." 496 U.S. at 13–14. The Court further explained that whether a challenged expenditure survived constitutional scrutiny

depended upon "whether the challenged expenditures are *necessarily or reasonably incurred* for the purpose of regulating the legal profession or 'improving the quality of legal service available to the people of the State.'" *Id*. at 14 (citing *Lathrop v. Donohue*, 367 U.S. 820, 843 (1961) (plurality opinion) (emphasis added)).

*Keller*, however, offered no further guidelines on how closely an activity must relate to the goals of improving the quality of legal services or regulating the legal profession, other than saying that it will not always be easy to discern. 496 U.S. at 15. What's more, the "reasonableness" standard that *Lathop* invoked and *Keller* reiterated has since then been repudiated. *See Janus*, 138 S. Ct. at 2465; *Harris v. Quinn*, 573 U.S. 616, 647–48 (2014).

In addition, as this Court previously recognized, *Keller* also "declined to address" the question of whether the state can compel an attorney to *join* a bar association as a condition of practicing law. *Crowe v. Oregon State Bar*, 989 F.3d 714, 727 (9th Cir. 2021); *see also Keller*, 496 U.S. at 17. This meant, too, that *Keller* never discussed whether the tailoring of the germaneness inquiry with respect to compelled speech differs or is the same as the tailoring required for the associational rights inquiry. *Id*.

The right answer is that the analysis should be *narrower* in the free association context, because an associational injury *cannot be cured* through opt-

3

out or refund procedures.  *See Taylor v. Buchanan*, 4 F.4th 406, 410 (6th Cir. 2021) (Thapar, J., concurring) (explaining that unlike speech claim based on dues paying an "association claim could go forward even if the bar association allowed lawyers to opt out of funding ideological activity.").  A claim of compelled speech through mandatory subsidization can be remedied through a refund.  But no such remedy is available for an association claim.

Fortunately, *Janus* and the Supreme Court's other recent free-association cases answer these questions and require exacting scrutiny for claims of compelled association.  Under exacting scrutiny, compelled association in an integrated bar is permissible "only when [compelled association] serve[s] a 'compelling state interest … that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox v. SEIU*, 567 U.S. 298, 310 (2012) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)). Applying that to the *Keller* situation, both compulsory membership *and* compulsory funding must serve a compelling state interest that could *not* be achieved through means significantly less restrictive of associational freedoms.

Thus the question here is: could OSB achieve the compelling interests of regulating the legal profession and improving the quality of legal services without engaging in the challenged activities?

Instead of confronting the argument of whether *Janus* supplements and clarifies *Keller* in the associational rights context, Appellees simply argue that *Janus* did not overrule *Keller*. Ans. Br. at 23. True, but Appellants need not show that it did to prevail.[1] Appellants argue here that *Janus* clarifies *Keller*. *See* Appellants' Opening Brief (AOB) at 22.

*Janus*, along with other recent freedom of association precedents from the Supreme Court, have answered the tailoring question that *Keller* left explicitly unresolved: *Janus* makes clear that exacting scrutiny applies to free association challenges. *See McDonald*, 4 F.4th at 246 n.21 ("*Keller* … 'fits comfortably within the [exacting scrutiny] framework.'" (citation omitted)). That means Oregon must prove that it cannot accomplish its legitimate state interests of regulating the practice of law and improving the quality of legal services through any means that are significantly less intrusive on freedom of association rights than compulsory membership is. It cannot prove that.

---

[1] Several courts, however, acknowledge that *Janus* places *Keller* on shaky foundations. *See Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720, 1720 (2020) (Thomas, J., dissenting from denial of certiorari) ("Our decision to overrule *Abood* casts significant doubt on *Keller*."); *McDonald v. Longley,* 4 F.4th 229, 223 n.14 (5th Cir. 2021), *cert. denied sub nom. McDonald v. Firth,* 142 S. Ct. 1442 (2022) ("*Janus* in particular, cast doubt on *Lathrop* and *Keller*."); *File v. Martin*, 33 F.4th 385, 391 (7th Cir. 2022), *cert. denied sub nom, File v. Hickey*, 143 S. Ct. 745 (2023) ("The tension between *Janus* and *Keller* is hard to miss."). Appellants likewise believe that *Keller* should be reexamined but recognize that this Court will be bound by it.

**II.  There is not a *de minimis* exception to the constitutional rule that bar associations can *only* force membership if the bar association engages *only* in germane activities.**

Appellees allege that "the Supreme Court's decision in *Lathrop* confirms that nongermane conduct only infringes a bar member's associational rights when it constitutes the 'bulk' or 'major' activity of the integrated bar." Ans. Br. at 26. This is certainly incorrect.

**First**, Appellees argue that "if a bar association engages in only one or two nongermane activities, it defies common sense that its member would be associated with (and constitutionally harmed by) that *de minimis* activity." *Id.* at 29. But under this theory, a bar association could support a bill that restricts or increases (say) abortion access, or release a statement calling for a repeal of the second amendment, or endorse a nuclear weapons freeze initiative, or even endorse political candidates—as long as those activities did not make up the "bulk" of what the bar does. That, however, would directly contradict *Keller*, which said that "[c]ompulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative." 496 U.S. at 16. Nothing in *Keller* suggested that mandatory subsidization can survive constitutional scrutiny just because the bar does a lot of other, non-infringing things.[2] No doubt one reason why is that it

---

[2] On the contrary, every case from *Abood* to *Keller* to *Janus* has recognized that people cannot be constitutionally forced to "affirm or support"—or to subsidize— "beliefs with which they disagree[]," even if the amount in question falls short of

would be impossible for a court to determine what constitutes a "bulk." That would require courts to parse the spending and speech of bar associations in ways that would, in fact, threaten the First Amendment rights of those bar associations. And requiring a plaintiff to prove that the violations of his or her constitutional rights exceeded some quantitative or qualitative threshold of the bar's overall activity would create an unreasonable, if not impossible, standard for a plaintiff to meet.

But **second**, and more importantly, there is no *de minimis* exception to the Constitution. *Boudreaux*, 86 F.4th at 636 ("we decline to recognize a *de minimis* exception to the rule from *Keller* and *McDonald*."); *McDonald*, 4 F.4th at 248–49; *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001) ("There is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification"); *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality op.) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *cf. Bonham v. D.C. Libr. Admin.*, 989 F.2d 1242, 1245 (D.C. Cir. 1993) (no *de minimis* exception to the Establishment Clause).

---

the "bulk" of the perpetrator's activities. *Janus*, 138 S. Ct. at 2471. For example, in *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 870 (1998), only about 19 percent of the union's actions were "nongermane." Yet the Court still held that objecting workers were entitled under the First Amendment to a proportionate refund of their dues.

Although *Lathrop* used the term "major activity," it did not establish any *de minimis* threshold. Rather, it "merely permitted states to compel practicing lawyers to pay toward the costs of regulating their profession." *Crowe,* 989 F.3d at 728. *Lathrop* did not even address the broad freedom of association claim at issue here. *See id.* at 727–28; *McDonald*, 4 F.4th at 244.

The Fifth Circuit has squarely rejected the argument for a *de minimis* exception to First Amendment rights, in both *McDonald* and *Boudreaux*.[3] In *McDonald*, the Texas Bar argued that "[l]egislative activities constitute a miniscule portion of the Bar's operations" constituting "just 0.34% of the Bar's proposed budget," Appellees Br., *McDonald v. Longley*, No. 20-50448, 2020 WL 4436953 at *22 (5th Cir., July 30, 2020), but the Fifth Circuit explained that "[w]hat is important" for purposes of a freedom-of association claim "is that *some* of the [Bar's] legislative program is non-germane." 4 F.4th at 248 (emphasis in original). "Some" in this context does not mean "major activity," a term the Fifth Circuit could have used but did not. It means simply that a person cannot be forced to join an association, or fund it, unless the state proves that its "compelling state interest[s] … cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 138 S. Ct. at 2465 (citation omitted).

---

[3] Appellees claim (Ans. Br. at 28) that the Texas Bar Association did not make the *de minimis* argument in *McDonald*, but it did. *See* 4 F.4th at 248 ("some lobbying was germane, but most was not.").

Likewise, in *Boudreaux,* the Fifth Circuit reaffirmed that there is no "major activity" requirement, when it held that the Louisiana State Bar Association (LSBA) violated the free association rights of Randy Boudreaux even though the nongermane activity there was not a "major activity" of LSBA.  LSBA argued that even if it engaged in nongermane speech, that speech was *de minimis*.  The Fifth Circuit rejected this, too, and held there was no "*de minimis* exception to the rule from *Keller* and *McDonald*."  86 F.4th at 636.

The Ninth Circuit should follow the Fifth Circuit's reasoning and reject Appellees' "major activity" argument, as even arguably "miniscule" activity can violate the First Amendment.  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 36–37 (2004) (O'Connor, J., concurring) ("There are no *de minimis* violations of the Constitution—no constitutional harms so slight that the courts are obliged to ignore them.").

**III.  Germaneness must have limits and OSB has surpassed those limits in both its legislative program and its decision to print two politically charged statements.**

Both the legislative activity engaged in by OSB and the two statements published by OSB in the *Bar Bulletin* are nongermane because there is no inherent connection between them and the "legal profession or the practice of law." *Boudreaux*, 86 F.4th 620 at 633.

**A.  The legislation challenged by Plaintiff was not directly related to the improvement of legal services or the regulation of lawyers qua lawyers.**

OSB's legislative activity fails to meet the rigorous standards laid down in *Keller,* clarified in *Janus*, and demonstrated in *McDonald*.  As the Fifth Circuit has explained, "advocating changes to a state's substantive law is non-germane to the purposes identified in *Keller*"—and therefore not something that OSB can legitimately force Appellants to subsidize—because "[s]uch lobbying has nothing to do with regulating the legal profession or improving the quality of legal services."  *McDonald*, 4 F.4th at 247–48.  Instead, such advocacy is "directed entirely at changing the law *governing* cases, disputes, or transactions *in which attorneys might be involved*."  *Id*. at 248 (emphasis in original).

Appellants have identified sixteen bills supported by OSB that are nongermane because they were not inherently related to the regulation of lawyers or the improvement of the quality of legal services, but are instead focused on changing the law that governs cases, disputes, or transactions.  All sixteen are therefore nongermane.  Appellees' arguments to the contrary are plainly incorrect, as are their two preliminary arguments with respect to their legislative advocacy.

**1.  The Court should reject Appellees' preliminary arguments.**

**First**, Appellees assert that none of the bills supported by a voluntary bar section could violate Appellants' associational rights because the advocacy was not

undertaken by OSB itself, but by its subsidiary "sections." Ans. Br. at 31. The

Court should reject this argument. For one thing, this is a *factual question,* and one

Appellees did not raise below. Appellees are making this argument for the first

time on appeal, and urging this Court to make a factual determination—one for

which there is **<u>no evidence</u>**[4]—that the actions of the voluntary sections of OSB

aren't attributable to OSB. As this Court well knows, it is improper to raise a

factual argument for the first time on appeal. *United States v. Rodriguez-Gamboa*,

946 F.3d 548, 552 (9th Cir. 2019).

**Second**, Appellees allege that "the unrebutted evidence showed that the

OSB did not even engage in legislative advocacy in support of" HB 4010 (2018).

Ans. Br. at 32. To support this contention, Appellees cite to the Declaration of

Susan Grabe, which states that "OSB included HB 4010 on a preliminary list of

possible legislation to support, but the OSB did not submit public testimony in

support of the bill." SER-33. Putting aside Appellees' contention that not offering

public testimony in support of a bill is the equivalent of not supporting a bill (it's

not), Appellees' assertion is contradicted by their own official documents. In the

2018-2020 "Diversity Action Plan Implementation Report: Year 2," HB 4010 is

---

[4] For example, OSB points to no bylaws which say that the actions of the voluntary
sections of OSB are separate from OSB or to that the voluntary sections operate
independently from all OSB procedures.

*specifically* listed as one of the "[b]ills that the bar supported in the 2018 legislative session." 2SER.007.

### 2. Appellees engaged in at least sixteen instances of nongermane legislative activity.

Appellees misunderstand the narrow nature of the germaneness inquiry in asserting that all 16 instances of legislative activity identified by Appellants on appeal are germane to the regulation of lawyers or the improvement of the quality of legal services.[5] None of these items were inherently related to the regulation of lawyers or the improvement of the quality of legal services, because each of these instances involved OSB advocating for changes to the state's substantive law, rather than changes strictly to the state's court system or the legal system at large. And that means these items are categorically nongermane. *McDonald*, 4 F.4th at 247–48.

To briefly recap,[6] in 2021, OSB supported SB 513, which added a half-credit civics education to high school graduation requirements. ER.288. Appellees argue this was germane because it increased the public's understanding of the court system. Ans. Br. at 34. But this has nothing to do with *regulating lawyers as*

---

[5] Appellees rest on the district court's decision that at least nine of the bills were germane because Appellees now advance the theory that those nine bills were supported by voluntary sections of OSB but Appellees present no argument for how each one of those bills is actually germane other than saying this court should accept the reasoning of the district court.

[6] For more detail, *see* AOB at 9–14.

*lawyers*, or improving the quality of legal services in the state, or even the legal system at large. It changed the state's *substantive* law, and took a policy position on the curriculum of high school students. As *McDonald* recognized, if that's germane, everything would be germane.

Consider also the "access to justice" purpose advanced by Appellees. They argue that SB 513, and many other bills are germane, because they increased "access to justice." *See, e.g.,* Ans. Br. at 5. They base this argument on a passage in *McDonald* concerning the provision of *pro bono* services. *McDonald* held that increased funding of pro bono programs was germane because these programs "improve[] the quality of legal services available to low-income Texans, given that they would otherwise have no legal services at all." 4 F.4th at 250. In other words, there, the program in question was about *directly* giving individuals better legal services. That bill was specific to law and the court system.

SB 513 was nothing of the sort because it does not concern the direct provision of legal services or the regulation of lawyers. Again, to interpret germaneness so broadly would "eviscerate the limitation on the use of compulsory fees to support unions' controversial political activities." *Knox,* 567 U.S. at 320.

In another example, Appellees claim SB 829 is germane. (Ans. Br. at 35) But that bill advocated for legislative changes for eviction in foreclosure proceedings. ER. 302. Appellees say this increased "access to justice" and

clarified a law that "even judges found confusing." SER-31. Ans. Br. At 11. But the fact that judges found the law confusing merely means there were multiple interpretations available, and the OSB supported "changing the law *governing* cases, disputes, or transactions *in which attorneys might be involved*," which the *McDonald* rightly said is *not* the regulation of lawyers, and therefore *not* germane for *Keller* purposes. 4 F.4th at 248 (emphasis in original). If it were germane to advocate for changes in a law that any judge finds confusing, then the bar weighing in on any conceivable subject would be germane.

The same is true of all the other examples Appellees discuss. SB 359 (2019) created a process for the ratification of certain defective actions of shareholders or corporations. E.R.306. SB 360 (2019) extensively modified Oregon's Nonprofit Corporations Act. ER.309–10. SB 185 (2021) sought to allow a nonprofit's board of directors or members to act electronically—including by email—so long as doing so is not prohibited by the articles of incorporation. ER.293–94. SB 361 (2019) directed trustees to consider additional factors when managing a trust, including sustainable or socially responsible investment strategies. ER.311–12. HB 2459 (2019) allowed lienholders to ask for payoff amounts from other lienholders. ER.307–08. SB 183A (2021) proposed to establish a process for recognizing judgments of tribal courts as "foreign judgments." ER.297–99. Each of these examples concerned changes to the state's *substantive law,* with no

inherent relation to the regulation of lawyers qua lawyers. Thus they were

nongermane.[7]

Appellees say four other bills supported by OSB that involve lawyers were

germane because they directly regulate the legal profession: SB 180 (2021), which

sought to require insurers to notify a claimant directly in certain cases when paying

more than $5,000 to settle a third party liability claim (ER.289–90); SB 182A

(2021), which sought to terminate the authority of a spouse to act as an agent under

certain estate planning documents upon annulment, separation, or dissolution of a

marriage (ER.291–92); SB 768A (2021), which sought to amend statutes related to

OSB (but in the process would exempt OSB and its committees from being

required to record and make public its telephonic or video meetings, as is generally

required of public bodies) (ER.300–01); and SB 297 (2021), which sought to allow

judicial marshals to be included within the definition of "police officers" for

purposes of the Public Employees Retirement System. (ER.287). But none of

these pass the *Keller* test.[8]

---

[7] Likewise, HB 4010 (2018) aimed to create a taskforce to address racial disparities in the context of home ownership. ER.030. HB 4008 (2018) sought to prohibit courts from considering race or ethnicity in calculating protected future earning potential in a civil action. *Id.* SB 295 (2021) sought to define terms related to "fitness to proceed" in criminal trials and clarified when a criminal defendant may be referred to the Oregon State Hospital. *Id.* If it's germane to opine on *what factors a judge may consider*, then absolutely all lobbying would be germane.

[8] OSB also supported SB 181 (2021), which sought to require courts to consider whether access to justice would be promoted when awarding attorney fees, even

SB 180 and 182 are textbook examples of advocating for changes to substantive laws or disputes "in which attorneys might be involved." *McDonald*, 4 F.4th at 248 (emphasis omitted). While advocating for some parts of SB 768 might be germane, the fact that this bill exempted OSB and its committees from standard public records law transforms this, like the two bills above, into advocating for changes to laws governing disputes in which attorneys might be involved, because the resulting bill did not govern OSB. As for SB 297, while aimed at an issue that implicates the judicial system, it was not directly related to judicial processes, lawyers, or judges. If it were germane, so too would be OSB's advocacy for (say) separate lanes on the freeways for lawyers and judges—because that would help them get to work faster.

Thus, all sixteen bills pressed by Appellants on appeal are nongermane.[9]

_____

when the attorney bringing the case did so pro bono. ER.295–96. Unlike the pro bono activities upheld as germane in *McDonald*, this bill was not aimed *solely* at pro bono activities, as it would allow judges to consider whether access to justice would be promoted in awarding attorney fees even if the attorney did not bring a case pro bono. *Cf. McDonald*, 4 F.4th at 250. Thus it, too, was non-germane, because it did not govern the legal profession, but helped guide judges in how to decide cases.

[9] Appellees allege that Appellants press seventeen pieces of legislative advocacy on appeal. While Appellants certainly alleged seventeen instances of legislative advocacy were nongermane at their motion for summary judgment, Appellants have only pressed sixteen instances on appeal and have not raised on appeal whether SB 358 (2019), which sought to permit the Department of Revenue to disclose an attorney's taxpayer information for certain disciplinary actions, was germane.

**B.      Both the OSB Statement and the Affinity Bar Statement were nongermane.**

Appellees doom their own argument for the germaneness of the OSB Statement by terming that statement as one "condemning white nationalism." Ans. Br. at 37. Condemning white nationalism and lauding access to justice and the rule of law are worthy behaviors, but such conduct is not "inherently related" to the regulation of lawyers. *See Boudreaux*, 86 F.4th at 634.

In *Boudreaux*, the Fifth Circuit in considering a challenge to the Louisiana Bar Association, explained that germaneness "requires inherent connection to the practice of law and not mere connection to a personal matter that might impact a person who is practicing law." *Id*. at 633. That *inherent connection* requires the statements to be specifically concerned with the practice of law, not directed towards general exhortations that affect lawyers and nonlawyers alike. Offering some examples, the Fifth Circuit explained that "[p]romoting diversity efforts at law firms is germane, but opining on affirmative action is not. … [r]aising awareness of the failure of firms to retain women is germane, but speech encouraging or discouraging abortion (or abortion insurance coverage for attorneys) is not." *Id*.

Likewise, here, the OSB Statement was aimed at condemning incidents of alleged white nationalism that were not related to the practice of law or the legal profession in Oregon, specifically. And while OSB attempted to tie the statement

into more general principles of equality and the importance of a fair judicial system, that's simply not enough to make a general statement about the state of society writ large germane. *See, e.g., id.* ("[a]dvice is not germane just because, in the association's view, it improves 'wellness' and therefore the practice of law indirectly.").

The "Joint Statement of the Oregon Specialty Bar Associations Supporting the Oregon State Bar's Statement on White Nationalism and Normalization of Violence" ("Joint Statement") is equally—if not more—problematic. ER.351. That statement specifically references and *condemns* then-President Donald Trump. Whatever one thinks of President Trump, **no person can be compelled by force of law to associate with another person's or group's opinion.** Through these statements, the bar gratuitously injected itself (and its members) into a highly charged political debate; one not specifically relating to either *the practice of law* or *the improvement of legal services*.

Appellees argue that these statements must be considered two separate statements, and that the Joint Statement is not attributable to the bar. Ans. Brief at 39. This Court should reject both assertions.

First, this Court has made clear that context matters in free speech cases: "[T]he context in which speech is uttered may … supply necessary premises that are unexpressed but widely understood by readers or viewers. [Courts] should not

ignore external factors that contribute to a complete understanding of speech, especially when they are factors that the audience must consider in evaluating the words." *FEC v. Furgatch*, 807 F.2d 857, 863–64 (9th Cir. 1987). Here, the context makes clear that the two statements must be viewed together. OSB— which had sole discretion over what would be published and how—chose to present these related statements on facing pages, formatted as a single message. OSB knew what the Joint Statement said and made the decision to place them on consecutive pages with a shared border. OSB knew the statements would not be read separately, and that the contents of the Joint Statement and its explicit agreement with OSB's statement would together inform the reader.

Second, the evidence shows that Joint Statement is attributable to the bar for purposes of a free association injury. It is undisputed that OSB had sole authority to publish or not publish the Joint Statement, and knew the contents of the Joint Statement before publication. And Appellees even concede in their brief that OSB had the intention to push a specific message; it says the purpose was to "support[] diversity in the legal community and emphasiz[e] the rule of law." Ans. Br. at 41. Again—perhaps worthy motives; but nongermane all the same. *Boudreaux*, 86 F.4th at 632.

**IV.  Appellants free association claim does not depend on whether other individuals associated Appellants with OSB's conduct or whether OSB membership curtailed Appellants ability to express their own views.**

Appellees assert that Appellants can only succeed on their compelled association claim if they prove one of two things:  that being a member of OSB impairs their ability to express some sort of message, or that other individuals associated Appellants with the OSB's activities.  Ans. Br. 41–46.  That is not and has never been the law of freedom of association.

The freedom of association protects against state interference "with individuals' selection of those with whom they wish to join in a common endeavor," including political and ideological endeavors.  *Roberts*, 468 U.S. at 618.  This right "plainly presupposes a freedom *not* to associate," which is more than just a freedom from the assumptions of others (as, for example, being assumed by others to belong to an organization).  *Id.* at 622–23.  The issue is not merely whether some third party might think Appellants endorse OBS's activities; but rather, whether Appellants are forced to join, and be considered members of, a political and ideological organization they do not support.

Freedom of association is a separate and distinct right from free speech.  Being required to join an organization is itself an injury irrespective of whether any third parties think Appellants support OSB's activities or whether Appellants are free or not to vocalize their own opinions.  On the contrary, as *McDonald* made

clear, the relevant inquiry is whether the group engages in "expressive association," *not* whether the victims of compelled association remain free to complain about the fact publicly. 4 F.4th at 245. That makes sense, for two reasons.

First, the question of whether "alternative channels of communication" are left open is a question asked under *intermediate* scrutiny. *See, e.g., Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935, 939 (9th Cir. 2007). But freedom of association claims are governed by *exacting* scrutiny, which is a different test; it asks whether there is a "compelling state interest" that cannot be achieved "through means significantly less restrictive of associational freedoms." *Mentele v. Inslee*, 916 F.3d 783, 790 (9th Cir. 2019) (citation omitted). The latter test does not ask whether other alternative avenues of communication are open.

Second, the reason it does not ask that question is because compelled association is not cured by allowing the individual merely to complain about his injury. In *Janus,* for example, the law that forced Mr. Janus to join and subsidize AFSCME did leave him free to publicly say "I disapprove of AFSCME," nevertheless, the Court found that his associational rights had been violated. Likewise, in *Abood*, the Court said it violated the freedom of association to force Mr. Abood to pay for the union's political statements, regardless of the fact that the law left him free to publish an editorial stating, "I disagree with the union."

One case notably recognizing the difference between compelled association and compelled speech is *Carroll v. Blinken*, 957 F.2d 991, 999–1003 (2d Cir. 1992), which concerned a rule by which students at a university were automatically made members of an organization called NYPIRG, and required to fund it through student fees. The court found that students *could* be required to fund NYPIRG's germane activities (though not its non-germane ones, *id.* at 1002), but found that they could *not* be forced to join it. *Id.* at 1003. The students certainly remained free to say they disapproved of NYPIRG. But they were still forced to join—and the court found that violated freedom of association, in part because it "amount[ed] to special treatment" of NYPIRG, since it "[gave] [NYPIRG] an unearned advantage in the campus competition" between different student organizations. *Id.* The same is obviously true of OSB, which, like NYPIRG, claims to speak on behalf of all people within the category; even on its website right now, OSB's list of values purports to speak for "the bar" (lower case) in general, not OSB and its membership specifically. In short, while compelled association and compelled speech are often found in each other's company, they are different rights, with different contours, to which the Supreme Court has applied different tests. *See further* Seana Valentine Shiffrin, *What Is Really Wrong with Compelled Association?*, 99 Nw. U. L. Rev. 839 (2005).

*McDonald* made clear that, just like NYPIRG, compulsory bar associations are by their very nature—even if they only engage in germane activities—essentially expressive, in claiming to speak for everyone, and that "[i]f a member disagrees with that [message] then compelling his or her membership infringes on the freedom of association." 4 F.4th at 246 (citation omitted). *See also Boudreaux*, 86 F.4th at 640 ("because the LSBA engages in non-germane speech, its mandatory membership policy violates Boudreaux's rights to free speech and free association."). What matters in a freedom of association case such as this is whether the Appellants are being forced to join a group whose views they find objectionable. That is what is happening here, and it is unconstitutional.

## CONCLUSION

This Court should vacate the judgment, issue an injunction preventing the enforcement of Oregon's rules requiring Appellants to join OSB, and remand for further proceedings to render other relief Appellants request.

**RESPECTFULLY SUBMITTED this 11th day of December 2023,**

/s/ *Scott Day Freeman*
Scott Day Freeman
Adam Shelton
**Scharf-Norton Center for**
**Constitutional Litigation**
**at the GOLDWATER INSTITUTE**
*Attorneys for Appellants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,546 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2016 Times New Roman 14-point font.

Date: December 11, 2023

/s/ *Scott Day Freeman*
Scott Day Freeman
Adam Shelton
**Scharf-Norton Center for**
**Constitutional Litigation**
**at the GOLDWATER INSTITUTE**
*Attorneys for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Scott Day Freeman*
Scott Day Freeman